**Paul C. WEHR, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 90-185.**

Supreme Court of Wyoming.

Nov. 13, 1992.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Steven E. Weerts, Sr. Asst. Public Defender, Mike Cornia, Appellate Counsel, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Mary Frances Cadez, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,* and GOLDEN, JJ.

THOMAS, Justice.

The most troublesome issue in this case is whether the record discloses sufficient evidence to establish a criminal conspiracy to deliver controlled substances. Closely related to that difficult issue is the issue of whether the trial court erred in admitting

* Chief Justice at time of oral argument.

evidence of prior purchases of controlled substances by Paul C. Wehr (Wehr) from a co-conspirator. In addition, Wehr strenuously argues he was deprived of his constitutional right to a speedy trial. We hold the evidence of prior purchases of controlled substances from the co-conspirator was relevant and admissible in this case and all of the evidence was sufficient to establish a criminal conspiracy to deliver controlled substances. We further hold there was no violation of Wehr's constitutional right to a speedy trial. The judgment and sentence are affirmed.

Wehr sets forth the issues in this case, in his Brief of Appellant, as follows:

> I. Whether the testimony of Pamela Thompson concerning Appellant's alleged prior drug purchases was improperly admitted under Rule 404(b) of the Wyoming Rules of Evidence and any probative value was outweighed by its prejudicial effect under Rule 403.
>
> II. Whether the evidence was insufficient to establish that Appellant conspired to deliver a controlled substance in violation of Wyo.Stat. § 35-7-1042 (1977).
>
> III. Whether Appellant was denied the right to a speedy trial in violation of the United States and Wyoming Constitutions and Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming.

In its Brief of Appellee, the State of Wyoming restates the issues in this way:

> I. Whether the trial court properly admitted Pamela Thompson's testimony.
>
> II. Whether the evidence is sufficient to sustain Appellant's conviction for conspiracy to deliver a controlled substance.
>
> III. Whether Appellant was denied his right to a speedy trial.

In a two-count Information, Wehr was charged with conspiracy to deliver a controlled substance in violation of Wyo.Stat. §§ 35-7-1042 and -1031(a)(ii) (1988), and the delivery of a controlled substance in violation of Wyo.Stat. § 35-7-1031(a)(ii).[1] After a trial to a jury, Wehr was convicted on both counts.

These charges arose out of events that occurred in Riverton on December 23, 1988. An undercover police officer (officer) and a confidential informant met with Perry Greenhalgh to attempt to purchase drugs. Greenhalgh was the target of a criminal investigation being conducted by the Northwest Wyoming Drug Enforcement Team, a unit of the Wyoming Division of Criminal Investigation (DCI). Three DCI agents provided audio and visual surveillance of the meeting with Greenhalgh.

Initially, Greenhalgh agreed to sell, and the officer agreed to buy, an unspecified amount of cocaine. When efforts to procure the cocaine proved unsuccessful, Greenhalgh asked the officer if he would be interested in "crank," a street name for methamphetamine. The officer responded he would, and Greenhalgh then called someone he referred to as "Paul" to see if he could obtain that drug. After talking with Paul, Greenhalgh informed the officer he had a source and the price would be $60 per one-half gram. The officer agreed to purchase one gram.

The officer, the confidential informant, and Greenhalgh left Greenhalgh's residence and went to Wehr's home at Park Avenue Trailer Park, Space 234. Greenhalgh entered the trailer alone and returned shortly thereafter without having

1. Wyo.Stat. § 35-7-1042 (1988) provides:

> Any person who attempts or conspires to commit any offense under this article within the state of Wyoming or who conspires to commit an act beyond the state of Wyoming which if done in this state would be an offense punishable under this article, shall be punished by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy.

Wyo.Stat. § 35-7-1031(a)(ii) (1988) provides:

> (a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:
>
> (ii) Any other controlled substance classified in Schedule I, II or III, is guilty of a crime and upon conviction may be imprisoned for not more than ten (10) years, fined not more than ten thousand dollars ($10,000.00), or both; * * *.

obtained the methamphetamine. Greenhalgh stated they would have to come back forty-five minutes later. The officer, the confidential informant, and Greenhalgh then returned to Greenhalgh's residence.

After the officer and the others had left Wehr's home to return to Greenhalgh's residence, one of the surveillance agents observed Wehr leave his trailer and get into his Dodge pickup. That agent and another DCI agent followed Wehr in separate vehicles to 1103 Westwood Drive. At that address, Wehr parked his pickup and got into a Ford Bronco driven by Pamela Thompson (Thompson). While they drove around Riverton in the Ford Bronco, Thompson sold Wehr three grams of methamphetamine. After making the purchase from Thompson, Wehr returned to his trailer home.

The officer, the confidential informant, and Greenhalgh arrived within a short time. Greenhalgh again entered Wehr's trailer alone and, after a few moments, he returned with a baggie of drugs that he gave to the officer. Upon testing, the drugs turned out to be methamphetamine.

On March 2, 1989, the officer and two DCI agents returned to Wehr's trailer to discuss the December drug transaction with him. Wehr initially denied any involvement, but then he admitted he had bought methamphetamine from Thompson and had later sold it to Greenhalgh.

On May 26, 1989, a criminal complaint was filed in which Wehr was charged in two counts with conspiracy to deliver and the delivery of a controlled substance in violation of §§ 35-7-1042 and -1031(a)(ii). A preliminary hearing was conducted, and Wehr was bound over for trial in the district court. On June 20, 1989, an information was filed charging Wehr with the same crimes that had been alleged in the complaint. At his arraignment, Wehr entered pleas of not guilty, and the case was set for trial on September 18, 1989, as the fifth case in a stacked setting. The record discloses no formal continuance of the trial but, on October 3, 1989, the State filed a motion to dismiss the Information against Wehr, stating that a principal witness was unavailable for trial. The district court granted that motion on October 4, 1989.

On October 10, 1989, the State refiled a criminal complaint identical to the one previously filed against Wehr. The process was repeated, and Wehr eventually was brought to trial on April 16, 1990. On April 18, 1990, the jury found Wehr guilty of both counts alleged in the information. By the judgment and sentence entered on June 28, 1990, Wehr was sentenced on each count to a term of not less than one and one-half years nor more than three years to be served at the Wyoming State Penitentiary, with those sentences to run concurrently. In addition, he was fined the sum of $2,500 on Count II. Wehr has appealed from the judgment and sentence.

While it is not the primary issue in the case, we turn first to the issue concerning the evidence of prior drug purchases which was submitted through Thompson's testimony. Wehr contends this evidence was inadmissible character evidence, foreclosed by Wyo.R.Evid. 404 [2] or, in the alternative, it should have been excluded because of the provisions of Wyo.R.Evid. 403.

In pertinent part, Wyo.R.Evid. 404 provides:

2. Counsel for Wehr made only one objection, invoking Wyo.R.Evid. 404(b), and it was overruled during the course of Thompson's testimony. The colloquy from the record is:

> [COUNSEL FOR WEHR]: Your Honor, I'm going to object as beyond the basis of Rule 404(b) evidence of other bad acts as they are styled in the rules.
> [COURT]: Your objection's noted and is overruled.
> [COUNSEL FOR WEHR]: Thank you, Your Honor.
> [COUNSEL FOR STATE]: Have you ever been with him at any times when he's passed on methamphetamine to other people that you've delivered to him?
> [THOMPSON]: No, I have not.
> [COUNSEL FOR STATE]: Have you talked to him about it?
> [THOMPSON]: Yes, I've talked to him about it.
> [COUNSEL FOR STATE]: And has he at any time admitted to you he had done that?
> [THOMPSON]: He has admitted to me that he has sold to other people.

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

* * *.

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Wyo.R.Evid. 404, identical to the parallel federal rule, finds its antecedents in the common law, and the policy for excluding evidence of character or a trait of character was said to be "the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948). Its intent is to avoid a demand that an accused defend acts of misconduct other than those charged in the indictment or information and to avoid potential confusion by members of the jury in addressing the issues of the case. The rule demands convictions are to be founded in those facts relevant to the crime or crimes charged. If the thrust of evidence of prior bad acts is only to demonstrate the defendant has a disposition to commit crimes, the evidence should be excluded.

We have summarized the application of Wyo.R.Evid. 404(b) in this way:

This rule operates to ban the use of evidence of a person's character in order to establish that the person's behavior on a particular occasion was in conformity with his character. *Ortega v. State,* 669 P.2d 935, 943 (Wyo.1983). Such evidence may, however, be admissible for other purposes. *Trujillo v. State,* 750 P.2d 1334, 1336 (Wyo.1988); *Coleman v. State,* 741 P.2d 99, 103 (Wyo.1987); *Brown v. State,* 736 P.2d 1110, 1112–14 (Wyo.1987); *Ortega,* 669 P.2d at 943. This court has adopted a rather liberal attitude toward admitting evidence of other crimes, wrongs or acts if it constitutes proof of one of the purposes in accord with Rule 404(b). *Marker v. State,* 748 P.2d 295, 297 (Wyo.1988); *Carey v. State,* 715 P.2d 244, 248 (Wyo. 1986).

*Pena v. State,* 780 P.2d 316, 318 (Wyo. 1989).

Our application of the provisions of Wyo. R.Evid. 404(b) is consistent with the view of a leading authority:

So frequent is the use of evidence of other acts and crimes for such purposes that it would be both fair and clearer to state the operative principle as one of inclusion, as many courts do. These words capture the substance of the principle: "Evidence of prior acts and crimes by the accused may be admitted in criminal cases on any issue to which it may be relevant, unless probative value is substantially outweighed by the risk of unfair prejudice, except that it may not be received if its only relevance is to show a propensity on the part of the accused." 2 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 140, at 172 (rev. 1985) (footnote omitted.).

Our cases afford deference to the determination by the trial court that evidence is admissible pursuant to Wyo. R.Evid. 404(b) *Longfellow v. State,* 803 P.2d 848 (Wyo.1990). As long as there is a legitimate basis for a trial judge's ruling, we will not say there has been an abuse of discretion. *Longfellow.* Although our application of this rule affords broad discretion to the trial judge, it is not unlimited. *Longfellow.*

We examine claims of error pursuant to Wyo.R.Evid. 404(b) under the five-part analysis articulated in *Bishop v. State,* 687 P.2d 242 (Wyo.1984), *cert. denied,* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985); *Coleman v. State,* 741 P.2d 99 (Wyo.1987). The factors addressed in that analysis are: (1) clarity of proof; (2) remoteness in time; (3) purpose for introduction; (4) materiality; and (5) need for the prior bad act evidence. In applying this

analysis, we do recognize that the exceptions articulated in Wyo.R.Evid. 404(b) are illustrative rather than exhaustive. *Longfellow.* Application of the *Bishop* and *Coleman* factors to the evidence in this case leads us to conclude the trial judge did not abuse his discretion in admitting Thompson's testimony.

Thompson was a direct participant in the conspiracy alleged in the information, and she was the only witness called by the State who had personal knowledge of prior drug transactions. The clear inference from her testimony was that the transactions she was involved in occurred within five years of trial.[3] Thompson's testimony was evidence of a "course of conduct" that was relevant to the charge of conspiracy. Her testimony related to the issue of whether she and Wehr were partners in the criminal activity and also addressed the question of whether Wehr obtained the methamphetamine for resale. In *Dorador v. State,* 768 P.2d 1049 (Wyo.1989), we recognized the proposition that course of conduct testimony is an important item of circumstantial evidence in conspiracy cases.

There are other reasons for affirming the admission of Thompson's testimony pursuant to Wyo.R.Evid. 404(b). The defense theory, maintained throughout the trial, was that no witness could actually identify Wehr as the person who delivered methamphetamine to Greenhalgh on December 23, 1988. Thompson's testimony was relevant to the issue of identity because it served to place in Wehr's possession methamphetamine that ultimately was turned over to the investigating officers by Greenhalgh. It established, on the part of Wehr, an intent, a plan, and a motive to purchase the drugs for resale on the date in question.[4]

With respect to Wehr's claim that the testimony of Thompson should have been excluded as unduly prejudicial under Wyo.R.Evid. 403, we hold there was no error. The potential for prejudice inheres in almost every instance in which evidence is offered pursuant to Wyo.R.Evid. 404(b), but we can find no basis to conclude the trial court abused its discretion in this case. Thompson's testimony carried significant probative value with respect to the existence of the charged conspiracy and also with respect to the crime of delivery of a controlled substance.

We next turn to Wehr's contention that there was not sufficient evidence to sustain his conviction on the conspiracy charge. The essence of his argument is that he and Thompson did not specifically conspire or agree to sell controlled substances to Greenhalgh on December 23, 1988. Wehr argues the transaction on December 23, 1988 was only a single sale and Thompson's interest in the transaction extended no further than being assured he was satisfied with the product.

Conspiracy is a specific intent crime, and it commonly is defined as an agreement between two or more people to commit an unlawful act. *Phillips v. State,* 835 P.2d 1062 (Wyo.1992); *Bigelow v. State,* 768 P.2d 558 (Wyo.1989); *Jasch v. State,* 563 P.2d 1327 (Wyo.1977). Under widely-adopted statutory concepts, a conspiracy is completed when an agreement has been made and some overt act is performed in furtherance of the conspiracy. *See, e.g.,* Wyo.Stat. § 35–7–1042 (1988); 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.5 (1986). The agreement that must be shown to support a conviction of a conspiracy to commit a crime is not the same as the "meeting of the minds" de-

3. Thompson testified she got a job with the Wyoming State Hospital on November 30, 1989 and, prior to that, she had worked for the Holiday Inn for approximately six months. Ms. Thompson also testified she was unemployed prior to working at the Holiday Inn and she then had a $250.00 a month drug habit which she supported by dealing drugs. She testified to selling drugs for approximately three years.

4. In its Traverse to Defendant's Motions in Limine directed at Thompson's testimony, the State stated that the testimony would be used at trial as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

manded for a contract. In *Bigelow,* 768 P.2d at 562, we said:

> One might suppose that the agreement necessary for conspiracy is essentially like the agreement or "meeting of the minds" which is critical to a contract, but this is *not* the case. Although there continues to exist some uncertainty as to the precise meaning of [the] word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement.

In Wyoming, a special statute has been adopted by the legislature to govern conspiracies involving controlled substances. Section 35-7-1042 justifies law enforcement personnel in prosecuting, at the earliest possible stage, criminal partnerships that are designed to violate Wyoming's Controlled Substances Act. *See Dorador,* 768 P.2d 1049. The statute provides, in pertinent part:

> Any person who attempts or conspires to commit any offense under this article within the state of Wyoming * * * shall be punished by imprisonment or fine or both * * *.

Any requirement that an overt act be accomplished in furtherance of the conspiracy so a complete conspiracy may be prosecuted is absent from § 35-7-1042. In *Apodaca v. State,* 627 P.2d 1023 (Wyo.1981), we recognized no demonstration of an overt act is required under this statute.

The State satisfies its burden of proof in a conspiracy case involving controlled substances by proving beyond a reasonable doubt that: (1) there existed at least a tacit understanding between the defendant and a co-conspirator to commit an act violative of Wyoming's Controlled Substances Act; and (2) the defendant intended to commit the elements of the offense which was the object of the understanding. Circumstantial evidence may be relied upon to establish a conspiracy due to the covert nature of the crime. *See, e.g., Jandro v. State,* 781 P.2d 512 (Wyo.1989); *Dorador.*

We recently have reiterated our summarization of the standard of review for the sufficiency of the evidence in a criminal case:

> [T]his court must determine whether, after viewing the evidence and appropriate inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *Jennings v. State,* 806 P.2d 1299, 1302 (Wyo.1991) (quoting *Munson v. State,* 770 P.2d 1093, 1095 (Wyo.1989)).

*Dreiman v. State,* 825 P.2d 758, 760 (Wyo. 1992).

An analysis of the evidence of the conspiracy in this case persuades us the State produced ample evidence at trial from which a jury rationally might conclude Wehr and Thompson were co-conspirators in a drug distribution chain. First, the State introduced evidence Thompson and Wehr were engaged in an ongoing source-to-middleman for resale relationship that was mutually beneficial. Thompson testified she was a drug addict and she supported her habit by selling drugs to others. She said she had known Wehr for a number of years and she had sold drugs to him repeatedly for his personal use and for resale. Her testimony was that Wehr would buy only a quarter gram or half gram for his personal use but, when reselling drugs to others, he would buy substantially larger quantities. Thompson told the jury Wehr had admitted to her in the past that he resold drugs obtained from her to support his own habit.

The State also established by Thompson's testimony that Wehr and Thompson knowingly engaged in the source-to-middleman resale transaction on the date at issue. Thompson testified she sold three grams of methamphetamine to Wehr on December 23, 1988 and she had "no doubt" Wehr then would deliver the drugs to someone else. Furthermore, one of the DCI agents testified Wehr admitted, in the course of the March 2, 1989 interview, he had purchased

methamphetamine from Thompson on December 23, 1988 which he later sold to Greenhalgh.

Finally, the State presented evidence that Thompson's interest in drug transactions extended well beyond simply satisfying the immediate customer. Thompson testified at trial that, after she had made the sale to Wehr, she was advised her name and that of Greenhalgh were being discussed over the police radio. Thompson immediately telephoned Wehr and told him someone was "wired" and he should not sell the methamphetamine to Greenhalgh. Thompson earlier had testified she would not sell controlled substances to Greenhalgh because he resold the drugs to "youngsters." When she was asked at trial why she phoned Wehr, Thompson responded, "[s]o he would not sell to Perry [Greenhalgh] because Perry's name had come over the scanner too, and Paul knows if he was going to sell to Perry I would never sell to him again."

We hold, given the admissibility of Thompson's testimony relative to the prior transactions with Wehr, the jury rationally could infer from all of this evidence, along with all of the other evidence introduced at the trial, that Wehr and Thompson had an ongoing conspiratorial relationship to distribute drugs in violation of Wyoming's Controlled Substances Act. The jury further could infer the transaction on December 23, 1988 was a product of the ongoing conspiracy and simply an example of the method Wehr and Thompson used to distribute controlled substances in violation of the Wyoming Controlled Substances Act.

We turn finally to Wehr's contention he was denied his right to a speedy trial in violation of the Constitutions of the United States of America and the State of Wyoming and Unif.R.Dist.Ct.Wyo. 204.[5] At the outset, we acknowledge the right to a speedy trial is a fundamental right guaranteed by the Sixth Amendment to the Constitution of the United States, and it applies to the states by virtue of the due process clause found in the Fourteenth Amendment. *Harvey v. State,* 774 P.2d 87 (Wyo.1989) (citing *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)). We also acknowledge the proposition that Article 1, Section 10 of the Constitution of the State of Wyoming insures the right to a speedy trial.[6] *Phillips v. State,* 774 P.2d 118 (Wyo.1989). We consistently have refused, however, to adopt the 120-day period set forth in Unif. R.Dist.Ct.Wyo. 204 as the absolute definition of the constitutional right to a speedy trial. *See, e.g., Osborne v. State,* 806 P.2d 272 (Wyo.1991); *Caton v. State,* 709 P.2d 1260 (Wyo.1985); *Robinson v. State,* 627 P.2d 168 (Wyo.1981) (discussing Rule 22 which was later renumbered as Rule 204).

5. Unif.R.Dist.Ct.Wyo. 204 provides:

**Rule 204. Speedy trial.**

(a) It is the responsibility of court and counsel to insure to each person charged with crime a speedy trial.

(b) A criminal charge shall be brought to trial within 120 days following the filing of information or indictment.

(c) The following periods shall be excluded in computing the time for trial:

(1) All proceedings related to the mental illness or deficiency of the defendant.

(2) Proceedings on another charge.

(3) Delay granted by the court pursuant to subdivision (d).

(4) The time between the dismissal and the refiling of the same charge.

(5) Delay occasioned by defendant's change of counsel or application therefor.

(d) Continuances may be granted as follows:

(1) On motion of defendant supported by affidavit of defendant and defendants's counsel.

(2) On motion of the prosecuting attorney or the court if:

(i) The defendant expressly consents; or

(ii) he state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(e) Upon receiving notice of possible delay the defendant shall show in writing how the delay may prejudice his defense.

(f) If the defendant is unavailable for any proceeding at which his presence is required, the time period shall begin anew upon defendant's being available.

Since this case was decided, Rule 204 has been superseded by Wyo.R.Crim.P. 48.

6. Wyo. Const. art. 1, § 10 states, in pertinent part:

In all criminal prosecutions the accused shall have the right * * * to a speedy trial * * *.

Instead, we have stated a number of times that no precise length of delay automatically will constitute a violation of the defendant's right to a speedy trial. *See, e.g., Harvey; Phillips; Caton.*

In accord with this articulation, we have applied the balancing test articulated by the Supreme Court of the United States in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).[7] Under the analysis promulgated in *Barker,* we look at: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice resulting from delay. We consider these four factors together and balance them in light of all other relevant circumstances. *Osborne.* The determinative dynamic in our inquiry is whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial. *See Zanetti v. State,* 783 P.2d 134 (Wyo.1989); *Cherniwchan v. State,* 594 P.2d 464 (Wyo.1979); *Cosco v. State,* 503 P.2d 1403 (Wyo.1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). Attached as *Appendix A* is a chronology of the significant steps occurring in the prosecution of Wehr's case which we perceive to be helpful in evaluating the reasonableness of the delay.

While we have declined to assign to Unif. R.Dist.Ct.Wyo. 204 controlling significance in determining whether the constitutional right to a speedy trial has been violated, we have recognized it as a factor that must have been considered in the context of the *Barker* analysis. *Osborne.* Rule 204 provided generally that all accused persons should have been brought to trial within 120 days of the filing of an information or indictment against them. Within the rule were found specific exclusions of time periods which may be taken into account in calculating whether the 120-day rule was violated. Of those particular exclusions, only the dismissal exclusion is relevant in this case. Unif.R.Dist.Ct.Wyo. 204(c)(4). Pursuant to that provision, the period from October 4, 1989 to December 5, 1989, a total of 62 days, would be excluded from the calculation of the time from the filing of the information to trial.

The information in this case was initially filed on June 20, 1989. It was dismissed on October 4, 1989, a period that encompasses 106 days. After the information was refiled on December 5, 1989, Wehr was brought to trial on April 16, 1990, a period of 132 days. The total time Wehr was charged by information prior to trial was 238 days.

In the context of a constitutional analysis, the time for a speedy trial begins to run with the filing of a criminal complaint or the arrest of a defendant. *Estrada v. State,* 611 P.2d 850 (Wyo.1980). The criminal complaint was filed in this case on May 26, 1989, and the appellant was brought to trial on April 16, 1990. The total elapsed time, excluding the period between the dismissal and refiling of the complaint was 320 days. The 238-day period that must be counted for purposes of Unif. R.Dist.Ct.Wyo. 204, and the 320-day period that must be used in connection with the constitutional standard are time periods that match closely the delays found to exist in our recent case of *Osborne,* 806 P.2d at 277 (244 and 301 days, respectively). We recognized in *Osborne* that delays such as this are not presumptively prejudicial, but that they are significant enough to warrant further analysis. *Osborne; but cf. Harvey* and *Phillips* (cases find delay exceeding 500 days to be presumptively prejudicial).

We then turn to an analysis of the reasons for the delay in trial. In *Barker,* the Supreme Court of the United States provided guidelines to be invoked in determining the weight to be given to causes of delay which are attributable to the prosecution. The court there said:

> A deliberate attempt to delay the trial in order to hamper the defense should be

7. We initially adopted the *Barker* approach in *Cosco v. State,* 503 P.2d 1403 (Wyo.1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). Since *Cosco,* we have applied the *Barker* analysis to almost twenty cases raising the speedy trial issue, the most recent of which is *Phillips v. State,* 835 P.2d 1062 (Wyo.1992).

weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531, 92 S.Ct. at 2192 (footnote omitted).

We have recalled and applied the standards on numerous occasions. *See, e.g., Osborne* (neutral reason standard); *Sodergren v. State,* 715 P.2d 170 (Wyo.1986) (valid reason standard); *Estrada* (deliberate, neutral, and valid reason standards).

The chronology of this case, as reflected in *Appendix A,* does not readily disclose any specific, or significant, lapses in the prosecution of Wehr. Wehr's case was proceeding at all times at a deliberate pace. *Harvey* and *Phillips* clearly are distinguishable as is the case of *Stuebgen v. State,* 548 P.2d 870 (Wyo.1976), in which the court found long periods of inactivity not adequately accounted for by the State.

It is clear the overall delay occurring in this case did not stem from prosecutorial neglect or ill will. The trial, initially set for September 18, 1989, would have occurred within ninety days from the filing of the information. The State was preparing for trial on that date even though the case was stacked number five for trial. On August 29, 1989, a subpoena was issued at the request of the State for Greenhalgh to appear and testify on the trial date. When the sheriff was unable to locate Greenhalgh to serve the subpoena, the State was faced with the decision of proceeding to trial without a key witness, thereby jeopardizing the prosecution, or of asking for a dismissal, with the possibility of refiling the case if Greenhalgh could be found. The State chose the latter course. The result was that the prosecutorial process was started over again upon the refiling of a new complaint, and the duplication of the process led to a delay from the time the original complaint was filed.

When the principles outlined above are applied to the facts of this case, the delay attributable to the State arguably was justified because it was the result of a missing witness and should not be weighed against the State. At the very worst, and in the alternative, the reason for the delay was neutral and should not weigh heavily against the State. There is no evidence in the record to support any inference that the State requested the dismissal in bad faith or with a sinister motive.

The formula suggests we also examine delay attributable to the accused. In doing so, we weigh any delay properly attributable to the defendant against the delay chargeable to the State. We have frequently acknowledged a defendant may defeat his claim to a speedy trial by his own dilatory practices. *See, e.g., Harvey; Phillips; Cherniwchan.* In this case, a forty-day delay occurred between the filing of the second complaint and Wehr's appearance in court. This delay is fairly attributable to Wehr, who was working out of state when the second complaint was filed, and it took some time for him to get back to Wyoming to face the charges. Wehr's change of counsel also may explain in part this forty-day delay.

We have held it is not necessary for a defendant to assert his right to a speedy trial in order to identify a speedy trial violation. *Osborne.* However, we can, and do, consider whether the right was asserted, and how vigorously, in determining the reasonableness of any delay. *Osborne.* The action or inaction of the defendant in this regard is a reflection of the actual amount of prejudice being experienced. *Barker.* We recognize pretrial delay may be either prejudicial or beneficial to a defendant. *See Barker.* We also distinguish those cases of representation by counsel, as compared to those in which there was no representation, and there was a failure to assert the right to a speedy trial, giving less weight to a defendant's claim of deprivation when he failed to assert the speedy trial right while being advised by an attorney. *Estrada* (citing *Barker*).

In Wehr's case, the record discloses only one occasion on which it might be claimed that Wehr was asserting his right to a speedy trial. On August 16, 1989, the trial court held a suppression hearing that was going to be continued on a subsequent date. On that occasion, counsel for Wehr stated, "Your Honor, by not objecting to continuing this, I don't want to waive Mr. Wehr's right to a speedy trial." Neither Wehr nor his attorney made any other reference to the right to a speedy trial during the balance of the proceedings in the trial court.

We have recognized, with respect to the factor of prejudice, that, although an affirmative showing of prejudice is not absolutely required to demonstrate a violation of the right to a speedy trial, prejudice is a "very important factor," in fact a "key element," in the *Barker* speedy trial analysis. *Caton,* 709 P.2d at 1266. We held in *Caton* that "until delay exceeds a point where there is a 'probability of substantial prejudice,' the burden of proving prejudice should remain with the accused." *Caton,* 709 P.2d at 1266. In *Harvey* and *Phillips,* we concluded an eighteen-month delay was excessive and gave rise to a probability of substantial prejudice warranting a presumption of prejudice. *Harvey; Phillips.* We have not, however, ruled a delay like that occasioned in this case—ten and one-half months—gives vitality to a presumption of prejudice. *Osborne,* 806 P.2d 272; *Binger v. State,* 712 P.2d 349 (Wyo.1986); *Estrada,* 611 P.2d 850. The obligation of demonstrating prejudice, therefore, is assigned to Wehr in this case.

In *Barker,* the Supreme Court of the United States observed prejudice may consist of: (1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of defense. *Barker,* 407 U.S. 514, 92 S.Ct. 2182. Of these three styles of prejudice, Wehr argues only that he suffered pretrial anxiety. Specifically, Wehr asserts he experienced difficulty maintaining employment; he had to obtain new counsel; and his reputation in the community was tarnished. We already have noted Wehr's failure to object to the length of the prosecution below is indicative of the actual anxiety and prejudice he was experiencing. Wehr was employed during virtually the entire time he was being prosecuted—a better employment record than he had prior to the filing of these charges. Wehr did point out in this court the fact that he had to file a motion for a change of bond condition in order to continue his employment as a roughneck. That was not a source of unusual pretrial anxiety in this instance, however. As to the claim of new counsel being required, Wehr simply states the fact that he had to obtain a different attorney. Wehr cited no support from the record, and he made no argument on appeal concerning how this enhanced his anxiety level. Wehr, likewise, simply baldly asserted his reputation had been damaged without any sort of factual basis for that claim. It is true that a certain amount of inconvenience, anxiety, and societal disrepute accompanies the filing of any criminal charge. *See Grable v. State,* 649 P.2d 663 (Wyo.1982). In this case, Wehr has failed to demonstrate in any way that he suffered prejudice in any extraordinary or unusual manner.

When we balance the several factors in this case, we conclude that, although there was a delay in bringing Wehr to trial, the delay was not so great it was not effectively balanced by the other factors. The reason for the delay—the witness who could not be served with process—arguably justifies an extension in the time of prosecution. At its very worst, that delay was attributable to a neutral reason and does not weigh heavily against the State. The State prosecuted the case in a continuing manner at a deliberate pace, and there is nothing in this record that would serve to demonstrate bad faith or ill will. Wehr, having the benefit of counsel, failed to make any appreciable attempt to assert his right to a speedy trial. In addition, Wehr has made no showing that he suffered unusual prejudice by the pretrial delay, nor do we find any indication of that in the record. In light of this foregoing analysis, we cannot conclude the pretrial delay occasioned in this case substantially impaired Wehr's right to a fair trial so as to warrant reversal and dismiss-

al of all the charges. We hold there was no violation of the right to a speedy trial.

Persuaded, as we are, that there was no reversible error in the proceedings in the trial court, we hold the jury conviction and the judgment and sentence of the trial court must be affirmed. The judgment and sentence in this case is affirmed.

APPENDIX A

The record in this case reflects the following events on the dates indicated:

| | |
|---|---|
| May 26, 1989 | Complaint filed. |
| May 30, 1989 | Appellant arrested. |
| June 15, 1989 | Preliminary hearing. |
| June 20, 1989 | Information filed. |
| July 5, 1989 | Arraignment—trial date set for Sept. 18, 1989. |
| July 20, 1989 | Motion to suppress. |
| August 3, 1989 | State's designation of witnesses and exhibits. |
| August 16 & 25, 1989 | Suppression hearing. |
| August 25, 1989 | State's proposed jury instructions. |
| August 29, 1989 | Subpoena issued for Perry Greenhalgh. |
| September 6, 1989 | Subpoena returned for failure to locate Greenhalgh. |
| October 3, 1989 | Motion to dismiss filed. |
| October 4, 1989 | Motion granted. |
| October 10, 1989 | Complaint refiled. |
| November 20, 1989 | Defendant appears in court. |
| December 5, 1989 | Information filed. |
| December 12, 1989 | Case assigned to judge. |
| January 10, 1990 | Arraignment. |
| January 22, 1990 | Motion to suppress. |
| February 8, 1990 | Arraignment order. |
| February 26, 1990 | Defendant's witness and exhibit list. |
| February 27, 1990 | State's witness and exhibit list. |
| March 1, 1990 | Order denying motion to suppress. |
| March 7, 1990 | Pretrial conference. |
| March 12, 1990 | Pretrial report and order. |
| March 29, 1990 | Motion to change bond conditions. |
| April 11, 1990 | Motions in limine. |
| April 16, 1990 | Trial begins. |

URBIGKIT, Justice, dissenting.

I remain convinced that a conviction for a criminal offense should result from evidence relevant to facts of the actual commission of the crime. My continued belief and support for a nearly 500-year history of English-American law denying conviction based upon disassociated conduct or the accused's bad reputation remains unaltered. *Virgilio v. State,* 834 P.2d 1125 (Wyo.1992), Urbigkit, C.J. dissenting; *Brown v. State,* 736 P.2d 1110 (Wyo.1987), Urbigkit, J. dissenting. Contrary, however, to my history-based persuasion, this court continues to approve the expanding use of bad acts evidence to obtain conviction. It is a truism to recognize that a prosecution relies less on evidence of guilt when disassociated events/bad acts evidence can be substituted for real proof.

In my opinion, the motion in limine was unjustifiably denied. Proof that Paul C. Wehr purchased controlled substances for personal use and without actual evidence of resale provides no proof that he did purchase and *thereafter resell.* The purchases were completely separate in time and circumstance. How this court extends that prior occurrence to the charged offense of December 23, 1988 is not persuasively shown in this decision. The explanation that a previous personal use purchase provided evidence of a Christmas-time 1988 resale skips through a whole series of assumed and unproven events.

The bad acts evidence is actually used to define character, which then provides nonlogical justification for the jury decision about contested identity. The motion in limine should have been sustained.

The major justification for the conspiracy conviction within the evidence fares no better in logical fact analysis. We need not look for some agreement, defined by the majority as a "meeting of the minds," to fail miserably to be provided evidence of "tacit understanding." A tacit understanding—for this case it would be that Pamela Thompson was selling to appellant for appellant to sell to Perry Greenhalgh—is totally unproven. In failing to find any concert in purpose, I lack understanding where the conspiracy is demonstrable by any construction of the presented evidence except the shoehorn factor of earlier occurrence evidence, which did not demonstrate a resale intent. Appellant correctly tells us that the originator in sale, Thompson (nonindicted co-conspirator), had no real idea that appellant was going to sell and certainly not to sell to the alleged final buyer, Greenhalgh. Actually, the testimony of Thompson, if believable, was that she telephoned appellant after her sale to him and

warned against any sale to Greenhalgh, if that might have been intended.

We play games with words and reconstruct conspiracy into a happenstance joint involvement if a common purpose is not somehow required. Conspiracy, in plain meaning, of its own definition is:

> **Conspiracy.** A combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act, or some act which is lawful in itself, but becomes unlawful when done by the concerted action of the conspirators, or for the purpose of using criminal or unlawful means to the commission of an act not in itself unlawful.
>
> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he: (a) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (b) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime. Model Penal Code, § 5.03.

Black's Law Dictionary 309–10 (6th ed. 1990).

That combination or confederacy was not established in this evidence except by innuendo of bad acts evidence of a purchase at a different time and for a different purpose by appellant. This was not a "I want to sell to Greenhalgh. Will you get me the goods?" conspiratorial factual occurrence. Proof of any conspiracy between appellant and Thompson to peddle to Greenhalgh (or anyone else) is totally lacking here. *United States v. Falcone,* 109 F.2d 579, 581 (2nd Cir.), *cert. granted,* 310 U.S. 620, 60 S.Ct. 1075, 84 L.Ed. 1393, *aff'd,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Peoni,* 100 F.2d 401 (2nd Cir.1938).

I would also agree with appellant that Wharton's Rule applies, in that, the case lacks proof of a third party intent to be involved in the conspiratorial plan. Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 691 (3rd ed. 1982). The extensive case law on that subject, in consonance with the briefing argument of appellant, certainly justified this court's scholastic attention, although not provided in the majority opinion. Additionally, the majority applies at least a double inference to find evidence to justify the affirming decision. This is an inference conviction case based upon the bad acts of a prior purchase with no specifically known resale intent.

This court comes one more time to the speedy trial topic of constitutional and rule disposition of rights. Rules and principles, where justification for affirming conviction is applied, apparently mean little. We could justifiably step back and recognize what is approved is surely not speedy trial in any way. Balancing tests, in euphemistically used English, define harmless error justification for affirming a decision whether or not there is a denial of any realistic constitutional protection.

A look at the record is informative. This court is challenged to justify a procedure so haphazard in constitutional effectiveness to cause grave concern about what meaning we really give to constitutional protections. The alleged sale occurred December 23, 1988, involving a $120 transaction—one gram of methamphetamine. Five months later, a complaint was filed in May 1989. On October 3, 1989, the charges were dismissed to avoid speedy trial questions since the unreliable third person had apparently disappeared. On October 10, 1989, the charges were refiled after Greenhalgh had apparently been located. Trial then commenced in April 1990, or about sixteen months after the occurrence and eleven months after the first arrest.

It is now November 1992, approximately four years after an alleged one gram sale in a case where the sentence was a concurrent one and a half to three year term. This character of delay cannot benefit prosecution, defense, society, or even the concerns of purists like this writer who believe that constitutions should be given a plain meaning. *Allied–Signal, Inc. v. Wyoming*

*State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991).

I am sustained in this conclusion to dissent by the current decision of the United States Supreme Court, which recognizes that a right to a speedy trial does exist. *Doggett v. United States*, — U.S. —, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) should dispositively apply here in both moral persuasion and legal precedence.[1]

> The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial...." On its face, the Speedy Trial Clause is written with such breadth that, taken literally, it would forbid the government to delay the trial of an "accused" for any reason at all. Our cases, however, have qualified the literal sweep of the provision by specifically recognizing the relevance of four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result. * * *
>
> * * * * * *
>
> Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down. * * * Thus, in this case, if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. * * *
>
> The Government concedes, on the other hand, that Doggett would prevail if he could show that the Government had intentionally held back in its prosecution of him to gain some impermissible advantage at trial. * * *
>
> Between diligent prosecution and bad faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.

*Id.*, — U.S. at —, 112 S.Ct. at 2690–93.

I respectfully dissent.

1. Hopefully, this court's revision of a speedy trial protocol, which vests finite responsibility in the Wyoming Supreme Court itself after six months has passed, should at least, to some degree, end argument that a preclusive 120-day limitation provided by the prior Uniform District Court rule does not mean anything if the trial takes one to three years thereafter. *See* W.R.Cr.P. 48(b) (effective March 24, 1992).