Mindi Hobson LONGFELLOW,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 90–7.

Supreme Court of Wyoming.

Dec. 18, 1990.

Leonard Munker, State Public Defender, Wyoming Defender Aid Program, Gerald M. Gallivan, Theodore B. D'Arcy and Terrie Riley, Student Interns, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen.; John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., Kaylin D. Kluge, Asst. Atty. Gen., Cheyenne, for appellee.

Before URBIGKIT, C.J., and
THOMAS, CARDINE, MACY and
GOLDEN, JJ.

GOLDEN, Justice.

This case arises out of the short, brutal life and untimely death of Christopher Hobson, aged not quite three months. Appellant Mindi Hobson, now known as Mindi Hobson Longfellow, the child's mother, challenges her conviction of felony child abuse under W.S. 6–2–503 (Cum.Supp.1987) and of voluntary manslaughter under W.S. 6–2–105(a)(i) (Cum.Supp.1987).

Appellant raises the following issues:

I. Whether there is sufficient evidence to support the defendant's conviction of voluntary manslaughter.

II. Whether testimony concerning prior treatment of appellant's daughter, Valerie Hobson, by defendant and the temperament of defendant was improperly admitted under Rule 404(b) of the Wyoming Rules of Evidence.

We affirm.

## FACTS

From his birth on September 10, 1987, until December 2, 1987, Christopher Hobson resided with his mother, appellant Mindi Hobson, and her boyfriend, Brad Longfellow, in Brad's trailer in Cheyenne. On December 2, 1987, appellant spent most of the morning and early afternoon caring for Christopher and for her daughter, Valerie Hobson. Brad arrived home from work at about 4:30 p.m. that afternoon. Appellant left the residence at approximately 5:00 p.m. to run some errands, leaving Brad in charge of the children.

After appellant left, Brad and the children sat on the couch watching television. Christopher had been propped up in a corner of the couch with a pillow. The couch was about eighteen inches high.

Sometime around 6:00 p.m. Brad left the living room to place some wood on the stove, located in another room. He heard a thud and returned to the living room where he found Christopher lying on the floor in front of the couch. Christopher was gasping for breath. He soon became limp and unconscious. After several minutes of unsuccessful attempts to revive Christopher, Brad dialed 911 for help.

Emergency Management Services (911) logged the call in at 6:20 p.m. and dispatched an ambulance to the trailer. Appellant passed the ambulance about a mile from her house and "just knew it was going to her home." When the personnel from the ambulance service arrived at Longfellow's residence, they found that Christopher had no signs of heartbeat or resuscitation, and that he had become cyanotic or blue in color.

Appellant returned home to find the emergency personnel attempting to revive her son. Efforts to revive him at the scene were unsuccessful, and Christopher was transported to DePaul Hospital, where his heartbeat and breathing were finally stabilized. The attending physician noticed an obvious swelling over the right scalp above and behind Christopher's right ear.

Early on the morning of December 3, 1987, Christopher was transported to Children's Hospital in Denver. He was treated there for approximately twenty-four hours, after which it was determined that he had little chance of recovery. Life support systems were withdrawn at 11:55 a.m. on December 4, 1987, and Christopher was pronounced dead.

An autopsy was performed on Christopher at Denver General Hospital on December 5th. The autopsy revealed numerous injuries, both old and recent. The doctors

discovered external scrapes and bruises of various ages, new and old subdural hematomas, evidence of old torn or missing brain tissue, a total of eighteen rib fractures in various states of healing, and a three and one-quarter inch horizontal skull fracture. Christopher also had retinal hemorrhages of various ages caused by brain damage. The cause of death was determined to be brain injuries as a result of blunt trauma to the head. This caused brain swelling, which cut off blood supply to the brain and ultimately resulted in brain death.

The pathologist who performed the autopsy testified that the blunt trauma injuries were inconsistent with a fall from a couch, and that the accumulated injuries were probably caused by "three or four episodes of significant force." These injuries exhibited what he called "typical classical child abuse findings."

On the day following Christopher's funeral, December 11, 1987, police interviewed both appellant and Brad Longfellow concerning Christopher's death. Both were considered suspects at that point. Initially, Brad Longfellow was arrested and charged in connection with Christopher's death. After he passed a polygraph test, the charges against him were dismissed.[1] The investigation then focused on appellant Mindi Hobson. She was arrested and charged with second-degree murder of Christopher under W.S. 6–2–104 (June, 1983 Repl.), and child abuse of both Christopher and Valerie in violation of W.S. 6–2–503.

The charge of abuse of Valerie was dropped on preliminary hearing and appellant proceeded to trial on the other charges. Before trial, defense counsel filed a motion in limine seeking, inter alia, to exclude testimony as to appellant's abusive treatment of her daughter Valerie.

1. The trial court properly prohibited appellant's counsel from presenting evidence at trial concerning the charges initially filed against Brad Longfellow or of his having passed a polygraph examination.

2. Appellant's challenge is to admissibility under W.R.E. 404(b) and relevance. These claims overlap. We have stated that the requirement of

The trial court reserved ruling on this aspect of the motion until trial, when it decided that the testimony should first be presented outside the presence of the jury at which time the court would make a ruling on its admissibility.

At her jury trial, the state presented, over appellant's objection, testimony by appellant's brother, her sister-in-law, and Chris Vannest, appellant's former husband, concerning her alleged abuse of Valerie Hobson. The state also questioned Brad Longfellow about appellant's temper.

Appellant was convicted of voluntary manslaughter and felony child abuse. On December 1, 1989, she was sentenced to five to six years for voluntary manslaughter and four to five years for felony child abuse.

## DISCUSSION

We discuss appellant's second issue first, because a determination of whether the challenged evidence was properly admitted under W.R.E. 404(b) is a necessary prerequisite to a decision on appellant's sufficiency of the evidence claim. The evidence which tied appellant to the homicide was circumstantial. The evidence of appellant's character and prior conduct was therefore an essential part of the state's case and of our substantial evidence review.

### Admissibility of Evidence Under Rule 404(b)[2]

Appellant challenges the admission of testimony regarding her temper and her previous abuse of Valerie Hobson. She characterizes this evidence as irrelevant and as impermissible character evidence under W.R.E. 404(b), which reads in pertinent part:

Rule 404(b) that evidence be admitted for some other purpose besides proving character to show conformity therewith is merely a special rule of relevance. Coleman v. State, 741 P.2d 99, 103 (Wyo.1987). Therefore, we do not find it necessary to consider the question of relevance apart from admissibility of the challenged evidence under Rule 404(b).

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

\*    \*    \*.    \*    \*    \*

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

## Standard of Review

▆ W.R.E. 404(b) generally prohibits the introduction of evidence of extrinsic acts for the purpose of proving the accused's character and conformity therewith. However, the rule recognizes certain exceptions where the evidence is introduced for another purpose. These exceptions, enumerated in Rule 404(b), are illustrative rather than exhaustive. In determining admissibility on another ground beyond those stated, we look to see whether the trial court abused its discretion in light of our previous decisions. *Gezzi v. State*, 780 P.2d 972, 974 (Wyo.1989).

▆ On appeal, we give great deference to a trial court's determination concerning admissibility of 404(b) evidence. So long as there is a legitimate basis for a court's decision we cannot say that there was an abuse of discretion. *Pena v. State*, 780 P.2d 316, 318 (Wyo.1989).

This discretion is not without parameters, however. This court previously adopted a five-part test for admissibility of Rule 404(b) evidence:

1. The extent to which the prosecution plainly, clearly, and convincingly can prove the other similar crimes.

2. The remoteness in time of those crimes from the charged offense.

3. The extent to which the evidence of other crimes is introduced for a purpose sanctioned by W.R.E. 404(b).

4. The extent to which the element of the charged offense, that the evidence is introduced to prove, is actually at issue.

5. The extent to which the prosecution has a substantial need for the probative value of the evidence of the other crimes.

*Garcia v. State*, 777 P.2d 1091, 1096 (Wyo. 1989) (quoting *Bishop v. State*, 687 P.2d 242, 246 (Wyo.1984), cert. denied, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985)).

▆ These factors do not serve as absolute requirements for the trial court's exercise of its sound discretion. We give considerable deference to the trial court's discretionary balancing of these Rule 404(b) factors and to its additional required determination under W.R.E. 403 that the probative value of the evidence exceeds the danger of unfair prejudice to the defendant. *Gezzi*, 780 P.2d at 978; *Garcia*, 777 P.2d at 1096. That one of the stated factors is absent does not necessarily prevent the trial court from exercising its discretion and allowing in the 404(b) evidence. *Pena*, 780 P.2d at 318. In most instances, however, the factors will be present when evidence of the other crimes is properly admissible. *Coleman*, 741 P.2d at 105.

The broad latitude we allow for the admission of 404(b) evidence has led at least one justice to characterize it as "a rule of evidence which has been emasculated by judicial exceptions." *Gezzi*, 780 P.2d at 986 (Macy, J. specially concurring.) In recent years, this court has adopted a liberal attitude toward admitting evidence of prior crimes, wrongs or acts. *Pena*, 780 P.2d at 318; *Lauthern v. State*, 769 P.2d 350, 358 (Wyo.1989).

## Application

The testimony specifically complained of was given by Thomas Rick, appellant's brother, Tammy Rick, appellant's sister-in-

law, Chris Vannest, one of appellant's former husbands, and Brad Longfellow.[3]

Thomas Rick testified, over appellant's objection:

Q.   * * * What was [appellant's] behavior with Valerie?

A.   She was a typical mother I assume, real easy going.

Q.   Did you ever see her discipline Valerie?

A.   No.

Q.   Did you ever see her yell at Valerie?

A.   No.

\*      \*      \*      \*      \*      \*

Q.   Did you ever see bruises on Valerie?

\*      \*      \*      \*      \*      \*

A.   Yes.   At one time I had seen some small bruises on her rear end.

\*      \*      \*      \*      \*      \*

Q.   Were you concerned about the bruises?

A.   Yeah, in a way I was.   You know, there was some pretty bad diaper rash there too, and I was pretty concerned because I'm a father myself and those kind of things you keep under control.

Q.   Did you do anything about it?

A.   I consulted my wife about it, spoke with her about it.

Q.   Did you do anything else?

**3.**   Curiously, appellant fails to specifically complain of what may have been the most damaging testimony offered concerning her prior alleged abuse of Valerie.   Appellant was interviewed by the police before being charged, while both she and Brad Longfellow were still considered suspects.   Danny Glick, a detective with the Laramie County Sheriff's Department, testified concerning the interview:

Q.   Did there come a time during this interview when Ms. Hobson admitted abusing Valerie?

A.   Yes.

Q.   What did she tell you?

A.   * * * About an hour or so into the interview when I expressed to her that I had people that had told me different about how she treated Valerie, it was like somebody turned on a switch.   She admitted at that point that, yes, she had abused Valerie.

\*      \*      \*      \*      \*      \*

Q.   * * * Did Ms. Hobson admit striking Valerie in anger?

A.   Yes.

Q.   Did she say how often that occurred?

A.   Yes, I did.   * * * I was concerned about the children, the child, and I called the social workers to investigate.

Tammy Rick testified as follows, also over objection:

Q.   Okay.   Did you ever see bruises on Valerie?

\*      \*      \*      \*      \*      \*

A.   Yes, I did.

\*      \*      \*      \*      \*      \*

Q.   Were you concerned about those bruises?

A.   Yes.

Q.   Why?

\*      \*      \*      \*      \*      \*

A.   Because they didn't look like a normal bruise.   You know, like a falling down, whatever.   They looked like a battered bruise.

After a hearing outside the presence of the jury at which appellant's counsel objected to his testimony, Chris Vannest testified as follows:

Q.   Did you ever see Mindi get angry with Valerie?

A.   Yes.

Q.   What did she do?

A.   She threw an infant's small toy at her.

A.   Frequent enough to even scare her.

Q.   Did she indicate what kind of behavior this discipline or abuse was?

A.   Out of control.

Q.   Okay.   What did she say she did to Valerie?

\*      \*      \*      \*      \*      \*

A.   * * * There were bruises and marks left all over Valerie's body to include her face.

Q.   Did she say that she hit her on her arms?

A.   Arms, legs, back and face I believe it was.

Q.   Did she ever say that she shook Valerie?

A.   Yes.

Q.   What else?

A.   And threw her onto a bed.

\*      \*      \*      \*      \*      \*

Q.   And Ms. Hobson told you that Mr. Vannest had to restrain her?

A.   Yes.

Detective Glick also testified as to appellant's temper.   Appellant has implicitly challenged all admission of testimony regarding her prior abuse of Valerie and her temper.   Our analysis of 404(b) evidence, *infra*, would allow for the admission of the foregoing statements at trial.

Q. Did she ever do anything else?

A. Spanked her and shook her.

Q. How did she spank Valerie?

A. Like you would spank a five to eight year old, something like that, an older child.

\* \* \* \* \* \*

Q. And you observed her shake Valerie?

A. Yes.

Q. How did she do that?

A. Grab her from the front by the arms and pick her up off the bed and shook her and through [sic] her down.

\* \* \* \* \* \*

Q. Did you ever have to physically restrain Mindi to stop her from hurting Valerie?

A. Yes.

\* \* \* \* \* \*

Q. Did you ever see any bruises on Valerie?

A. Yes.

\* \* \* \* \* \*

Q. What type of bruises did you see on Valerie?

A. Around the bottom of her ankles and a [sic] imprint, hand imprint on her back.

Mr. Vannest went on to describe his concern about the alleged abuse and that he reported it to a social worker. He also stated that Mindi showed remorse after the incidents with Valerie.

Finally, Brad Longfellow testified as follows:

Q. Did you ever observe Mindi lose her temper?

\* \* \* \* \* \*

A. Since this time I've seen her lose her temper.

Q. How about prior to this time?

A. No.

\* \* \* \* \* \*

Q. Do you recall telling Detective Glick that Mindi's the one with the bad temper?

A. No.

The state elicited both specific instances of abuse of Valerie and general testimony regarding appellant's temper. Our required review of prior precedent leads us to the factually-similar case of *Grabill v. State*, 621 P.2d 802 (Wyo.1980).

In *Grabill*, the victim's mother went grocery shopping and left the victim at home with her boyfriend. When she returned, she found a bruise on the baby's right ear. The comatose baby was taken to a hospital where it was discovered that she had suffered brain damage from a blow to the head. At the boyfriend's trial for child abuse, the prosecution presented testimony concerning his prior abuse of other children from his two marriages. We found this "prior bad acts" evidence admissible under W.R.E. 404(b) because of its relevance to the question of intent and of which of two persons inflicted the injury—the defendant or the victim's mother. *Grabill*, 621 P.2d at 810.

■ The same concerns are present in this case: identity and intent. The prosecution needed to establish whether appellant or Brad Longfellow was responsible for the crimes against Christopher. This put "identity" at issue. The prosecution also needed to establish "intent" for purposes of the "intentionally or recklessly" requirement of the child abuse statute, W.S. 6-2-503(a)(ii) (Cum.Supp.1987). We hold that the testimony regarding abuse of Valerie was properly entered into evidence for purposes sanctioned by Rule 404(b).

■ Appellant argues that since second degree murder is a general intent crime, there was no need to prove intent in this case by admission of the 404(b) evidence. However, even a general intent crime requires a showing that the prohibited conduct was undertaken voluntarily. *Crozier v. State*, 723 P.2d 42, 52 (Wyo.1986). The instances of prior abuse were therefore relevant to show general intent. Also, specific intent is an element of the other crime charged, child abuse. Intent was therefore at issue in this case and was a valid reason for admitting the 404(b) evidence.

We examine the admitted testimony in light of the remaining *Bishop* factors:

(1) The prosecution put on sufficient testimony to "plainly, clearly, and convincingly prove" the prior bad acts, at least to the extent required for their admission under Rule 404(b). A total of four witnesses, including Officer Glick, testified to appellant's abuse of Valerie.

(2) The instances were not too remote from the date of the alleged abuse of Christopher to lack probative value or to be unfairly prejudicial to appellant. They occurred within two years prior to the circumstances of this case.

(3) The elements of identity and intent were very much at issue in this case.

(4) The prosecution had a substantial need for the probative value of the evidence of the prior bad acts, because of the circumstantial nature of its case against appellant and because of the existence of two possible suspects.

■ We hold the *Bishop* factors satisfied in this case. Having so held, we must next determine whether the testimony's prejudicial nature outweighed its probative value. W.R.E. 403; *Gezzi*, 780 P.2d at 978. This requires a finding that the evidence was not only prejudicial to the defendant, but unfairly so. *Elliott v. State*, 600 P.2d 1044, 1049 (Wyo.1979). The function of performing the comparisons required by Rule 403 is generally held to be discretionary with the trial court. *Id.* We do not find that the trial court abused its discretion in this instance.

■ The state also offered testimony about appellant's temper. We think this was admissible as evidence within the "course of conduct" exception of W.R.E. 404(b). This court has described such evidence:

> The testimony does not bear upon separate criminal occurrences or bad acts. Rather, it is helpful to explain what happened between appellant and his victim, and is integral to understanding the context of the crime charged. In some jurisdictions it is defined as the evidence of the *context of the offense* and consequently admissible with the reasoning that "events do not occur in a vacuum

and the jury has the right to have the offense placed in its proper setting."

*Scadden v. State*, 732 P.2d 1036, 1044 (Wyo.1987) (citations omitted).

Testimony about appellant's temper was helpful to explain what happened between her and Christopher and was integral to the jury's understanding of a pattern of child abuse. We hold that evidence of temper was properly admitted under the "course of conduct" exception to W.R.E. 404(b), and that its probative value was not outweighed by danger of unfair prejudice.

*Sufficiency of the Evidence*

■ Appellant challenges her conviction of voluntary manslaughter on the ground that there was insufficient evidence to support it. In another case also involving voluntary manslaughter, this court set forth the standard applicable to our review of sufficiency of the evidence:

> [A]fter conviction, on appeal, we view all the evidence in a light most favorable to the State, drawing all possible, reasonable inferences therefrom to determine whether any rational trier of fact could have found, beyond a reasonable doubt, the elements of the crime necessary for conviction. If, after viewing the evidence in this light, there exists sufficient evidence to support a conviction, the jury's verdict of conviction must be affirmed.

*Griffin v. State*, 749 P.2d 246, 248 (Wyo. 1988) (citations omitted).

This standard has been applied in previous child abuse cases to uphold convictions where the evidence leading to conviction was purely circumstantial. In *Grabill*, appellant challenged his conviction on sufficiency of evidence grounds. Rejecting this challenge, we said:

> This type of case is by necessity usually presented by the State on circumstantial evidence. The jury chose to accept the circumstantial evidence against appellant rather than his denial. The evidence was such as to form the basis for the jury to

draw a reasonable inference of guilt beyond a reasonable doubt.

*Grabill,* 621 P.2d at 806.

Appellant's claim of insufficiency of the evidence is rooted in two assumptions: that she had no opportunity to commit the crime after 4:30 p.m., and that the crime must have taken place after that time.

Brad Longfellow returned home at 4:30 p.m. When he received Christopher from appellant, he did not notice any injuries. Appellant was absent from the scene from approximately 5:00 to 6:30 p.m. Brad did not place his call to 911 until approximately 6:20 p.m., several minutes after Christopher fell off the couch. Thus, appellant argues, in order for her to have caused the fatal injuries, she would have had to inflict them before 4:30 p.m., at least one and one half hours before the time Christopher fell off the couch.

Assuming that appellant's argument is correct to this point, we turn to the medical evidence. Appellant claims that the medical testimony raises doubts about whether the incident could have occurred before 4:30 p.m. and therefore whether appellant could have struck the fatal blow. The question is whether this uncertainty would prevent a rational jury from finding appellant guilty of voluntary manslaughter beyond a reasonable doubt.[4]

At trial, Dr. George Thomas testified concerning the time of Christopher's injury:

Q. * * * Do you have any idea what the time would be for the brain to swell to a point where it would be flattened by the skull?

A. Well, that can be variable. It may be very very rapid or there may be a period of time for it to develop, and this is something that I think is very difficult to estimate the particular time in a particular case. I don't think it really can be done.

*  *  *  *  *  *

Q. What would be some of the symptoms of brain swelling?

A. Well, some of the symptoms would be things such as irritability of a child; in other words, seeming to be fussy, possibly crying. Another symptom would be—could be what we call lethargy which is a situation when the child's activities slow down, the child appears to be sleepy. * * *

Dr. Thomas further testified:

Q. Can you say that the injury occurred and that any type of symptom would occur within a certain period of time?

A. I can't give you times. All I could say is that the more severe injury one has whether it be a child or an adult, the shorter period of time of consciousness that one is going to have where they had injury. The less severe the longer period of time one would have and there may be what we call as I said before the late period where there may not be any symptoms and symptoms begin to develop and one may go through a number of these symptoms or all the symptoms that we talked about or none of the symptoms. So because of all these variables we can't narrow it down. *The best way to narrow these down is through circumstantial evidence which is witnesses and other things which would help to narrow it down.* (emphasis added).

Q. Do you have any way of knowing how long a time period it was from the time that the blunt trauma was applied to cause that skull fracture to the time when Christopher may have experienced cardiac respiratory failure.

A. No, I don't know.

Dr. Melinkovich, who attended Christopher at DePaul Hospital, testified that when a skull fracture occurs, there is always some evidence which appears immediately. Swelling appears "quite instantly" and an infant with such a fracture would be irritable, lethargic, tired or unconscious.

4. W.S. 6–2–105 (Cum.Supp.1987) defines voluntary manslaughter as follows:

(a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:

(i) voluntarily, upon a sudden heat of passion.

Dr. Melinkovich also indicated that he could not say definitively how long it would take the fluid to build up in the child's brain to cause cardiac arrest.

Although neither doctor could say for certain at what time Christopher received the fatal injury, enough evidence was presented to the jury that it could have found that the skull fracture occurred before 4:30 p.m. Both doctors testified that an infant with a skull fracture may remain lethargic and conscious for a period of time. Dr. Henry, another physician, testified that the head injury could have occurred "a number of hours" before the paramedics arrived at the scene.[5] Although Brad Longfellow testified that he noticed the lump on Christopher's head only after Christopher's fall from the couch, the jury could have discounted this testimony in light of the doctors' insistence that the blunt trauma Christopher suffered was inconsistent with the fall from the couch. Drawing all possible, reasonable inferences in favor of the state from the evidence presented, we hold that a reasonable jury could have determined that the fatal blow was struck before 4:30 p.m.

## CONCLUSION

Evidence of appellant's prior abuse of her daughter Valerie and of her temperament was properly admitted under W.R.E. 404(b) in order to prove course of conduct, intent and identity. There was sufficient evidence for the jury's verdict finding appellant guilty of voluntary manslaughter. We affirm appellant's conviction on both counts.

---

5. There was also evidence admitted at the preliminary hearing that Christopher could have received his injury at least three hours before his fall from the couch. However, this evidence was not presented at trial, and thus cannot be a part of our sufficiency of evidence review.