Gregory L. DANIEL, Appellant
(Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 94–195.

Supreme Court of Wyoming.

Aug. 16, 1996.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender; Deborah Cornia, Assistant Public Defender; David Gosar, Assistant Public Defender; Gerald M. Gallivan, Director, Wyoming Defender Aid Program; Gaston Gosar, Student Intern, for Appellant (Defendant).

William U. Hill, Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Mary Beth Wolff, Senior Assistant Attorney General, for Appellee (Plaintiff).

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN*, and LEHMAN, JJ.

THOMAS, Justice.

The primary issue in this appeal by Gregory L. Daniel (Daniel) from his conviction on two counts of indecent liberties with a minor is whether the prosecutor was guilty of misconduct in the way he dealt with prior bad acts in the course of the trial. A secondary, but major, issue arises out of Daniel's claim of denial of his constitutional rights to confrontation and due process because of a limitation on the cross-examination of an expert witness for the State. In addition, Daniel claims error based upon prosecutorial misconduct in asking questions and presenting argument that assumed facts not in evidence; a community outrage appeal; cumulative error relating to rulings on the admissibility of evidence intended to impeach Daniel's character witness; questions and evidence concerning collateral matters, hearsay, and testimony about Daniel's prior consistent statements; improper exclusion of expert witness testimony about false memories; and a comment by the investigating officer on Daniel's refusal of a second interview. We hold there was no error with respect to the prosecutor's handling of prior bad acts in the course of the trial nor in the limitation upon cross-examination of the expert witness. None of the other claims of error are sustained by the record. The Judgment and Sentence of the Court is affirmed.

Daniel presents seven issues, which encompass numerous sub-issues, in his Brief of the Appellant:

I. Mr. Daniel was denied his state and federal constitutional rights to confrontation and due process when he was prohibited from cross-examining Dr. [State's witness] concerning an error she made in a previous molestation case involving another defendant.

II. The prosecutor failed to follow the mandatory *Dean v. State [*865 P.2d 601 (Wyo.1993)*]* procedure before introducing 404(B) [sic] allegations made by A.H. and K.J.

III. Prosecutorial misconduct denied Mr. Daniel a fair trial when the State's attorney: 1) commented and introduced evidence concerning inadmissible 404(B) [sic] evidence; 2) asked questions assuming

* Chief Justice at time of oral argument.

facts not in evidence; 3) argued facts not in evidence, and, 4) made an improper community outrage appeal.

IV. A mistrial should have been declared when allegations were introduced that the K. children accused Mr. Daniel of molesting K.K., and these children were later prohibited from testifying, thus depriving Mr. Daniel of his right to confrontation and a fair trial.

V. Cumulative evidentiary error deprived Mr. Daniel of his right to a fair trial.

VI. Rights to present a defense and due process when the court excluded expert testimony on the influence that suggestive interviewing techniques have in producing false memories.

VII. Plain error occurred when Lt. [investigating officer] commented on Mr. Daniel's exercise of his state and federal constitutional right against self-incrimination.

The State, in the Brief of Appellee, articulates these issues:

I. Whether the trial court erred in determining admissibility of evidence under Rule 404(b)?

II. Whether Appellant received a fair trial?

During the summer of 1993, Daniel was on the staff of Therapeutic Foster Care, a program administered by Southeast Wyoming Mental Health Center, and his duties were to be a "big brother" or "guide" for children assigned to that program. Good friends of KS, whom she called "aunt and uncle," served as foster parents for severely neglected and abused children, and two of the foster children in the custody of the "aunt and uncle" were assigned to Daniel. KS and her two younger sisters boarded their horse at their "aunt's and uncle's" ranch, and they spent time each day cleaning pens and exercising horses in exchange for boarding of their horse. Daniel became friendly with KS and her sisters and enlisted their assistance in his work with the two foster children who were under his guidance.

As a reward for KS and her sisters, Daniel had suggested an outing in the Vedauwoo area. They went on this adventure in Au-gust and, after enjoying the outdoors and the scenery and climbing rocks, they returned to Cheyenne. Daniel took the three sisters to his house, and KS telephoned her mother to obtain permission for them to spend the night at Daniel's residence. Permission was granted, but only after the mother was satisfied Daniel's wife would be home. Daniel's wife did not appear to be pleased with these arrangements and generally stayed in other rooms in the apartment, having little interaction with Daniel and the sisters.

The entertainment that evening consisted of watching video tapes and, after the first one, Daniel and KS went to purchase snacks, candy, and liquor. After they returned with the food and drinks, each of the girls showered and put on long tee shirts Daniel provided for them to use as sleepwear. After the second video, the two younger sisters went into the spare bedroom of Daniel's apartment, closed the door, and went to sleep. KS stayed in the living room on the couch with Daniel.

Once they were alone, Daniel placed an arm around KS, lifted her tee shirt with his other hand, and placed his hand between her legs. He turned her around, placed her on his lap, and instructed her to kiss him, which she did. After the kiss, KS went into the bathroom because, "I just felt dirty and like I was going to throw up." KS returned to the living room where she and Daniel consumed some of the liquor. Daniel continued with sexual advances and contacts, which culminated in his coating KS and himself with Vaseline and inserting his penis in her vagina. Daniel also engaged in oral genital contact. During these activities, Daniel made written notes describing the victim. After his wife left for work the following morning, Daniel carried the victim into his bedroom and, again, inflicted sexual intercourse upon her. The two sisters were awake and observed Daniel carrying KS into the bedroom.

KS did not immediately complain but, in September, she became plagued by nightmares and attempted suicide twice. A friend became aware of KS's difficulties and told the school counselor. After talking with KS, the counselor called her father and law enforcement officers, who eventually deter-

mined the suicide attempts were a result of the sexual assaults. After KS had described the events involving Daniel, the investigating officer asked Daniel to come to the police station for an interview. Daniel denied any inappropriate behavior, but he did concede the three girls had spent the night at his apartment.

The investigating officer pursued the matter and learned Daniel had been a juvenile screening officer and also had served as a "guide" for Therapeutic Foster Care. In pursuing these leads, the officer identified four other children, KJ, AH, KeK, and KaK, ranging in age from six to twelve who informed the officer that Daniel had inappropriately touched them. In addition, the investigation led him to two older females, SB and JP, whom Daniel had been involved with in his role as a juvenile screening officer. Daniel's primary contention of error focuses upon the allusions, at trial, to the four younger victims of uncharged misconduct, none of whom ultimately testified. This claim of error can only be evaluated, as we do below, in the context of the testimony of the older victims of uncharged misconduct, who did testify.

An information was filed in which Daniel was charged with two counts of immodest, immoral, or indecent acts with a minor, KS, in violation of WYO. STAT. § 14–3–105 (1993).[1] The case was set for trial in March, when a jury was empaneled, and the trial proceeded.

During the second day of trial, a hearing was held in chambers to determine if testimony by the four younger children and the two older females about uncharged misconduct would be admissible as evidence of other wrongs or acts to show preparation or plan as permitted by WYO. R. EVID. 404(b). The trial judge faithfully followed the process articulated in *Dean v. State*, 865 P.2d 601 (Wyo.1993), and assessed the five factors as those related to the four younger children and also the two older females. The trial

court ruled the two older females would be permitted to testify; two of the younger children were competent and would be permitted to testify; and the other two children were not available, so a determination as to whether they could testify was not made at that time.

The record before the court is not clear as to exactly what occurred, but the parties agree a mistrial was declared on the third day of trial because, on cross-examination by Daniel's attorney, testimony concerning a proposed polygraph examination of Daniel was elicited from the investigating officer. After the declaration of mistrial, a new jury was empaneled the following week, and the case was retried.

The victim testified as to what occurred. Her two sisters corroborated her narration of the event; confirmed their location in the bedroom; and reported observing Daniel carrying their sister into his bedroom the following morning. At least one adult who was close to the victim described radical changes in her behavior immediately after the assaults. In addition, an examining physician testified about injuries she observed indicative of, and consistent with, "forceful penetration," that is, sexual intrusion. The physician stated the injuries were in various stages of healing consistent with the time of the assaults on the victim. Further corroboration of the victim's testimony included evidence seized in the execution of a search warrant, consisting of a jar of Vaseline; the couch in the Daniel apartment; the red and black robe he wore on the night of the assault; and pictures of other females concealed in a painting above the fireplace. Also introduced into evidence were charred remnants of paper, which the victim said were the notes Daniel had made while assaulting her, and which she had burned in a field.

1. WYO. STAT. § 14–3–105 (1993) provides:
 (a) Any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony, and upon conviction shall be fined

not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years, or both.
 (b) As used in this section, "child" means a person under the age of eighteen (18) years.

Two older victims of Daniel's sexual misconduct, SB and JP, testified to other uncharged misconduct. JP, particularly, offered compelling testimony concerning efforts by Daniel to "examine" her genital area in a manner similar to the "examination" he had conducted on KS.

Daniel testified in his own defense and denied any sexual contact with the victim. In addition, he produced testimony by character witnesses designed to establish his good character and his positive interaction with children. The jury returned a verdict of guilty on both counts, and Daniel was sentenced to serve seven and one-half to nine years on each of the two counts. The Judgment and Sentence of the Court provided those sentences should be served consecutively. This appeal is taken from that Judgment and Sentence.

■ In presenting his primary claim of error, Daniel contends the prosecutor made statements during *voir dire,* in the opening statement, and throughout the trial that Daniel had victimized ten-year-old KJ and twelve-year-old AH even though their proposed testimony had never been the object of a hearing addressing relevancy. Daniel argues the references to behavior with KJ and AH were inadmissible under WYO. R. EVID. 404(b). He endeavors to elevate his claims of error to constitutional magnitude by asserting violation of his rights to confrontation, due process, and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 6, 10, and 11 of the Constitution of the State of Wyoming.[2] Daniel does not advise us, in his brief or by his argument, of the particular manner in

which these rights were infringed in relation to the references to uncharged misconduct or the testimony of prior bad acts. We also are unable to perceive any infringement. Daniel does argue the statements demonstrate flagrant, intentional misconduct and bad faith by the prosecutor, and the prosecution's reference to KeK and KaK accusing him of molestation, without their actual testimony being presented, prevented him from rebutting their testimony or testing their credibility.

The crux of Daniel's claims is WYO. R. EVID. 404(b), which provides:

*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have said this rule restricts evidence of other crimes or "bad acts," stating specifically:

[i]ts intent is to avoid a demand that an accused defend acts of misconduct other than those charged in the indictment or information and to avoid potential confusion by members of the jury in addressing the issues of the case. The rule demands convictions are to be founded in those facts relevant to the crime or crimes charged. If the thrust of evidence of prior bad acts is only to demonstrate the defendant has a disposition to commit crimes, the evidence should be excluded.

---

2. U.S. CONST. Amend. V provides, in pertinent part:

No person shall * * *; nor shall he be * * * deprived of life, liberty, or property, without due process of law; * * *.

U.S. CONST. Amend. VI provides, in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right * * *; to be confronted with the witnesses against him; * * *.

U.S. CONST. Amend. XIV provides, in pertinent part:

Nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *.

WYO. CONST. Art. 1, § 6 provides for due process of law:

No person shall be deprived of life, liberty or property without due process of law.

WYO. CONST. Art. 1, § 10 affords an accused the right to confront witnesses:

In all criminal prosecutions the accused shall have the right * * * to be confronted with the witnesses against him, * * *.

WYO. CONST. Art. 1, § 11 protects an accused against self-incrimination and jeopardy:

No person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense.

*Wehr v. State*, 841 P.2d 104, 108 (Wyo. 1992).

We afford great deference to the trial court's determination of admissibility of prior bad acts evidence. As long as a legitimate basis exists for the trial judge's ruling, we will not find an abuse of discretion.

*Dean*, 865 P.2d at 606.

■ In order to review the legitimate basis for the judge's ruling, we have adopted a five-part test, which we have required trial courts to invoke in ruling upon admissibility.[3] After the court has determined the relevance of the evidence of prior bad acts in accordance with this five-part test approach, it then must determine whether the probative value of the evidence outweighs the danger of unfair prejudice or confusion of issues that may result from its introduction, pursuant to WYO. R. EVID. 403. *Dean*, 865 P.2d at 606. We have not required that all five parts of the test be satisfied, but the trial court must consider those factors.

■ During the course of the first trial that ended in a mistrial, a hearing was conducted in chambers addressing the admissibility of testimony of the six other children who were objects of Daniel's attentions. The theory articulated by the prosecutor was that Daniel had a pattern of finding employment in positions of trust, such as a juvenile screening officer or the Therapeutic Foster Care role, and befriending and gaining the trust of young potential victims. Daniel then relied upon that trust to engage in sexual activities with these young persons. The prosecutor proposed to present the testimony of these six witnesses as evidence of "ongoing course of conduct," an acceptable justification under WYO. R. EVID. 404(b). *Scadden v. State*, 732 P.2d 1036 (Wyo.1987); *Crozier v.*

*State*, 723 P.2d 42 (Wyo.1986); *Hopkinson v. State*, 632 P.2d 79 (Wyo.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Hatheway v. State*, 623 P.2d 741 (Wyo.1981); *State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957). In the course of that hearing, the prosecutor advised the court two of the six potential witnesses were not available. AH was a patient at the Wyoming State Hospital, and KJ was a patient at Children's Hospital in Denver. The judge responded, "[i]t seems to me that we needn't take up any time discussing the admissibility of evidence that would come from [AH] and [KJ]. They won't be here." The prosecutor agreed, "[a]t this point, no."

After identifying the factors to be considered according to *Dean*, the trial judge ruled that testimony of SB and JP was admissible. The judge found they were competent, could provide relevant testimony, the facts were less reprehensible than those of the charged sexual assaults, and the evidence would go to preparation and plan as provided for in WYO. R. EVID. 404(b). The judge proceeded to consider the competency of KeK and KaK to testify, and then carefully analyzed the *Dean* factors as they related to their testimony. He noted it seemed clear enough the act was committed, and the incident the witnesses would testify to occurred within one month of the charged assaults. As to the purpose for which the evidence would be admitted pursuant to WYO. R. EVID. 404(b), he stated there was the "pattern," that is:

> The preparation and plan and ongoing conduct to use position in this case as a therapeutic foster care worker. He would be in close proximity with the children, to have physical contact with them, to manipulate the position and relationship to perpetrate these acts on them, to try to conceal it

---

**3.** In *Garcia v. State*, 777 P.2d 1091, 1096 (Wyo. 1989), paraphrasing from *Bishop v. State*, 687 P.2d 242, 246 (Wyo.1984), *cert. denied*, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), we stated the five-part test as follows:

> 1. The extent to which the prosecution plainly, clearly, and convincingly can prove the other similar crimes.
> 2. The remoteness in time of those crimes from the charged offense.

> 3. The extent to which the evidence of other crimes is introduced for a purpose sanctioned by W.R.E. 404(b).
> 4. The extent to which the element of the charged offense, that the evidence is introduced to prove, is actually at issue.
> 5. The extent to which the prosecution has a substantial need for the probative value of the evidence of other crimes.

This is the version of the test invoked in *Dean v. State*, 865 P.2d 601, 606 (Wyo.1993), and *Longfellow v. State*, 803 P.2d 848, 851 (Wyo.1990).

from discovery from being reported, make it appear that it was legitimate.

The judge addressed the fourth factor in this fashion, "[d]oes the defendant dispute the issue on which the state is offering the prior bad act as evidence. Well, the defendant disputes that he did the act charged. He will attack the credibility of the witness [KS]." As to the fifth factor, the extent of the need of the prosecution for the probative value of the evidence of the ongoing course of conduct, the judge ruled it was relevant because the incidents involving SB and JP had occurred fifteen months earlier while the event to which KeK, KaK, and AH could testify occurred within one month of the incident with KS. The judge finished the analysis by weighing the probative value of the evidence against the danger of unfair prejudice to Daniel, and he finally announced the testimony of KeK and KaK would be admissible, but he limited the scope to time and event.

While AH and KJ were older than KeK and KaK, they were similar in some respects. All were severely sexually abused from an early age and suffered from severe emotional disturbance as a result. Each of the youngsters had been removed from his or her family and had been placed in foster care. All were receiving emotional counseling and were being taught more acceptable social skills. Daniel had access to their confidential files, knew their histories, knew what stimuli they responded to, and had opportunities to be alone with them. It appears the prosecution and the defense accepted the fact that the analysis of the five *Dean* factors, as they related to KeK and KaK, was applicable to the testimony of AH and KJ, if they should be available to testify.

 In part, that acceptance may be founded on our rules with respect to the sexual assault cases, in which the word of the victim is counter-posed to the word of the defendant. In that regard, we have said:

We do note that one of the principal reasons for allowing evidence of prior acts or crimes in cases involving sex offenses is the fact that the usual situation places the testimony of a victim against that of the accused, increasing the pertinency of intent, knowledge, plan, motive, etc. In the words of one case cited by Justice Thomas:

"The testimony was also admissible * * * as evidence tending to buttress the credibility of M and S, minor witnesses who had been charged by the accused with fabricating the evidence against him. Where proof necessarily depends on the credibility of testimony of child witnesses about sexual acts performed in private, and where the accusations of misconduct are flatly denied by the accused, evidence of similar acts may be received on the issue of the credibility of the minor witnesses."

*Grabill v. State,* 621 P.2d 802, 810 (Wyo.1980) (citations omitted).

*Grabill* was more recently cited and applied in *Johnson v. State,* 872 P.2d 93, 98 (Wyo. 1994).

Further support for the assumption that the *Dean* requirements were satisfied is found in the *voir dire* where the prosecutor twice told the potential jurors they would hear the testimony of several witnesses including six-year-old KaK, eight-year-old KeK, and ten-year-old KJ. The record does not reveal any particular attention being given to those comments and, later, the prosecutor referred to AH, KJ, KeK, and KaK at various junctures without objection. In fact, defense counsel refuted the comments of the prosecutor in his opening statement, and he also mentioned AH, KJ, KeK, and KaK several times.

The trial continued in this vein, with frequent references to the victims of uncharged misconduct until it became apparent Daniel intended to demand the confidential juvenile records of those witnesses, including any psychiatric or psychological records, for the purpose of cross-examination. The trial court then appointed a guardian *ad litem* to represent the interests of KeK, KaK, and KJ. At a hearing in chambers, the guardian *ad litem* reported that, as the guardian *ad litem,* he was the owner of the privilege relating to those records, and he advised the court he would not waive the privilege. The court became concerned about the possible implications of this dynamic in the trial and

the statutory premise for the claim of confidentiality. It does not appear any suggestion was made to the court that the problem might be resolved by applying *Gale v. State*, 792 P.2d 570 (Wyo.1990). The court left the matter in limbo by stating, during the hearing in chambers with the guardian *ad litem:*

> [SB] is 20. I think I'll need to take a look at the state of the record after that testimony is in and see just what, if any, justification there is for going ahead with the testimony of these children, assuming that it were possible in the current state of affairs.
>
> So we'll return to the courtroom and go on with our case and we'll contact you [guardian *ad litem* ] before there are any further proceedings.

At that juncture, the trial resumed in the courtroom, and the prosecution continued its direct examination of the investigating officer who recounted how he had located KJ, AH, and KeK. The defense counsel then, for the first time, complained about such evidence and offered these comments in a hearing at the bench:

> [DEFENSE COUNSEL]: Well, Your Honor, in view of the proceedings in court—or in the chambers this morning or this afternoon, inquiry, I believe, is leading—could lead the jury to believe, that there is evidence that exists that may never be presented to them. So I would ask the Court to limit the inquiry at this time **until the Court can determine what it's going to do in this matter.**
>
> THE COURT: Yes, I think it would be best if we—better if we don't have any further mention of those witnesses for now. (Emphasis added.)

The proceedings then continued, and the tenor of the direct examination began to shift as illustrated by the following:

> Q: [PROSECUTING ATTORNEY] Skipping [KeK], did you identify other victims that you talked to?
>
> A: Yes.
>
> Q: Who and when?
>
> A: It would be [JP] and [SB].

After the discussion of SB and JP, the following testimony and dialogue is found in the record:

> Q: Now, you indicated—Well, during the course of your investigation that you have described, how many children did you locate that had been touched in some inappropriate manner by Mr. Daniel?
>
> [DEFENSE COUNSEL]: I'll object. I think this would be hearsay.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: I move that it be stricken.
>
> Q: [PROSECUTING ATTORNEY]: Without going to the number of children, did you find that any of them had made a timely report to law enforcement of the incident that they were describing to you?
>
> A: None of them did.
>
> Q: Is this fact that the children failed to make a timely report within a day or two of being touched or molested, is that a common or uncommon occurrence in your experience?
>
> A: It's a very common occurrence in child molest cases.

Ultimately, the trial court ruled the four youthful witnesses could not testify about uncharged misconduct. That ruling was not made until the next day of the trial and some 170 pages of the record intervened. The court then said:

> THE COURT: Well, in the present state of the record you may well be right. I don't know. These are—This whole 404(b) admissibility business is extremely delicate, fraught with danger. We now have the Dean case. I don't know. I view the record right now as being one in which the jury has in front of it a fair amount of evidence of other similar conduct going to the plan, preparation, pattern of conduct, use and abuse of the position of trust, the pattern of using position to gain the confidence of young people, then taking advantage of that to commit improper sexual acts.
>
> I wonder what the testimony of these other little children could add to it. I just question whether they would add very much. Then we would be looking at the

problem of their testifying and the extent to which defense would then be able to go into their records testing their capacity to accurately observe, to recall. You then get into the individual instances that have been mentioned here on the record of possible auditory hallucinations, prior incidence of accusations.

It is evident from the record that counsel perceived these comments as a ruling that the other victims of uncharged misconduct could not testify and, apparently, both parties acquiesced in that decision.

From that point on, the prosecutor did not interrogate any witnesses about uncharged conduct with respect to the children who were the subject of the ruling. He did cross-examine Daniel about his work with AH and KJ. He also cross-examined Daniel's wife about her interaction with and knowledge of SB, JP, AH, KJ, KeK, and KS and her sisters.

■ Daniel particularly complains about the prosecution's reference to "children" in his closing argument. Daniel insists this reference to "children" was impermissible. The prosecutor, however, had evidence in the record in the form of testimony from the victim to whom the formal charges related and two other young females, SB and JP, who were under the age of eighteen when SB was subjected to a proposition and JP was molested by Daniel. Our statute defines the age of majority:

> Upon becoming eighteen (18) years of age, an individual reaches the age of majority and as an adult acquires all rights and responsibilities granted or imposed by statute or common law, except as otherwise provided by law.

WYO. STAT. § 14–1–101(a) (1993).

The same age is used to define a child in the statute proscribing indecent liberties:

> As used in this section, "child" means a person under the age of eighteen (18) years.

WYO. STAT. § 14–3–105(b) (1993).

Given the evidence from KS, SB, and JP, the references to "children" or "victims," which are criticized and complained of by Daniel, seem appropriate. The witnesses who did testify were children in accordance with the statutory definitions at the time that Daniel mistreated them. Since there were three, it was not inappropriate for the prosecutor to allude to "children" or "victims" in the plural.

Daniel argues this was a close case, and the prosecutor's comments were unduly prejudicial to him. He relies upon *People v. Cruz*, 100 A.D.2d 882, 474 N.Y.S.2d 142 (1984), for the proposition that, even when there is no showing of bad faith by the prosecutor in referring to the expected testimony of a key witness and no motion for mistrial is made, references to such a witness unduly prejudice the defendant and require a new trial, when the evidence is far from overwhelming. This case is distinguishable from *Cruz* with respect to the quantum of evidence. The record in this case does not justify the argument that this evidence was far from overwhelming. There was no **undue** prejudice to Daniel.

■ Daniel argues the only corroboration of the victim came from the testimony of the physician. That contention is less than candid. Corroboration in this record exists in the form of the testimony of the victim's two sisters, evidence seized pursuant to the search warrant, and the ashes from Daniel's notes that the victim described to the investigating officer. The use of similar locations, ploys, and approaches by Daniel with SB and JP, demonstrating misuse of his position of trust, all corroborate the testimony of the victim. Daniel simply seeks to invoke a different standard of review and have the court examine the evidence in the light most favorable to him. We remind Daniel that the correct standard recently was reiterated in *Curl v. State*, 898 P.2d 369, 375 (Wyo.1995), where we said:

> The appellate test for sufficiency of evidence is whether a rational trier of fact could have been sufficiently armed by the evidence to find the essential elements of the offense beyond a reasonable doubt. In assessing that issue, we view the evidence in a light most favorable to the state, affording them the benefit of all reasonable inferences to be drawn therefrom. It is not our task, let alone our place, to re-

weigh the evidence or reexamine the credibility of the witnesses. (Citations omitted.)

Daniel also cites *Boyd v. State*, 528 P.2d 287 (Wyo.1974), *cert. denied*, 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975), which held that the failure to produce a witness promised in the opening statement of the State was not prejudicial to the accused because the jury was instructed to disregard any argument, statement, or remark of counsel having no basis in evidence. Daniel argues the prejudice to the accused missing from *Boyd* is present in this case, but Jury Instruction No. 1, given in this case, contains the same language alluded to in *Boyd*, that is, "[a]rguments, statements, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but are not evidence." We discern no difference between the two cases; apply the principles from *Boyd*; and hold, because of the instruction, that there was no prejudice from the failure to produce promised witnesses in this case.

No reversible error arising out of the application of *Dean* by the trial court can be found in this instance. Neither was there error in the prosecutor's proper reference to children or multiple victims. The standard with respect to the admissibility of evidence is abuse of discretion, and we hold no abuse of discretion occurred in this instance. There was no error attributable to discussion, or the handling, of evidence of prior bad acts, even though the stand of the guardian *ad litem* created an awkward situation during the trial.

In his next contention of error, Daniel asserts he was denied his right to confrontation when counsel was restricted from proceeding with the cross-examination of the expert medical witness for the prosecution. That cross-examination sought to elicit a misdiagnosis in an unrelated prior sexual assault case. In the first trial that ended in a mistrial, Daniel was permitted to cross-examine the prosecution's expert witness with respect to the prior unrelated case. The following testimony was elicited, which became the offer of proof at the second trial:

Q: [DEFENSE COUNSEL] And do you recall submitting or stating in your report that what you saw was motile sperm?

A: Both the laboratory technician and I saw motile sperm. We followed the directions with the rape kit to the letter, unfortunately without police assistance some of the initial specimens were lost. The state unfortunately allowed contact of the alleged perpetrator with the child's mother who, following that contact, having been beaten, recanted her testimony and the state chose not to prosecute the case.

Q: Well, isn't it a fact though that what you submitted as being evidence of motile sperm was, in fact, found by several people including the state crime lab to be yeast?

A: The state crime lab found yeast on the swabs I submitted. The state crime lab did not see the slides that the lab technician and I saw. And there was also absolutely no reason why there should have been yeast in the rectal vault of a five-month-old unless sexual assault had occurred.

Both the Sixth Amendment to the Constitution of the United States and Article 1, § 10 of the Constitution of the State of Wyoming preserve the right to confront witnesses testifying against a defendant. The right is not without its limitations, however, and "[c]ourts recognize what might be called a hard-edged limit on impeachment by contradiction, drawn from common-law tradition and captured in the notion that contradiction on 'collateral matters' is improper." 3 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 320 (2d ed.1994). Contradicting a witness, as Daniel attempted here, is a recognized method of impeachment by showing something the witness said is erroneous. The New York court defined the rule regarding impeachment on cross-examination of a witness, using collateral matters through extrinsic evidence, and had this to say:

The general rule is that a cross-examiner cannot *contradict* a witness' answers concerning collateral matters by producing extrinsic evidence for the *sole purpose* of impeaching credibility. However, an exception to this rule exists where the evi-

dence sought to be introduced is relevant to some issue in the case *other than* credibility or if independently admissible to impeach the witness. The reason for this exception to the collateral evidence rule is evident from the policy considerations underlying the general rule. The collateral evidence rule is said to rest upon auxiliary policy considerations of preventing undue confusion of issues and unfair surprise by extrinsic testimony. Also, testimonial errors concerning distant and unconnected points are of inferior probative value.

*People v. Schwartzman,* 24 N.Y.2d 241, 299 N.Y.S.2d 817, 821, 247 N.E.2d 642, 644–45 (1969), *cert. denied,* 396 U.S. 846, 90 S.Ct. 103, 24 L.Ed.2d 96 (1969) (emphasis in original, citations omitted).

■ The witness Daniel sought to impeach had testified about the evidence of trauma resulting from sexual activity, which she discovered upon a physical examination of the victim. Daniel endeavored to attack that expert's credibility by demonstrating that, in another case, she had made a mistake in her examination of a microscopic slide, which disclosed the presence of yeast, but the witness believed it contained motile spermatozoa. That case could be relevant if she had testified about microscopic examinations in this case, but there was no abuse of discretion on the part of the trial court when it concluded the cross-examination was not relevant to her testimony about the results of the physical examination of the victim. Furthermore, the effort by Daniel to impeach the witness failed because she did not concede she had been wrong in the other case. She did not retreat from, or qualify her testimony on, any point or admit other possibilities or uncertainty. Her testimony made it clear she and the lab technician had studied slides and agreed those slides contained motile spermatozoa. The state laboratory studied the results from the swab she had submitted but, apparently, did not examine the same slides. Daniel was unable to shake the doctor's testimony, and he would not have been able to bring in state laboratory personnel to testify otherwise because the state laboratory had not had access to the same slides she had examined.

Daniel's effort to impeach the doctor was contrary to the general rule because his cross-examination endeavored to contradict her answers relating to collateral matters by inquiring into extrinsic evidence for the sole purpose of impeaching credibility. This effort does not fit the exception to the rule because the evidence sought to be introduced was not relevant to some issue in the case other than credibility nor was it independently admissible to impeach the witness. There would have been the danger of causing undue confusion of issues, unfair surprise by extrinsic testimony, and little, if any, probative value.

■ We hold Daniel's effort to impeach the prosecution's expert witness raised a collateral matter, and the trial court correctly excluded it as irrelevant in the second trial. The ruling did not deprive Daniel of his right to a fair trial. Given the strength of the testimony of the victim and the fact that the testimony of the expert was only corroborative, a different result would not have occurred, even had the evidence been introduced in the second proceeding. This ruling was well within the discretion of the trial court, and that discretion was not abused.

■ We address only briefly the remaining claims in Daniel's litany of errors. Several of those relate to errors in ruling upon evidence concerning the impeachment of Daniel's character witnesses, questions concerning collateral matters, inadmissible hearsay, and denial of testimony about Daniel's prior consistent statements. The State essentially has collected these under the category of denial of a fair trial, and we agree with the State that no reversible error has been demonstrated. Several situations complained about clearly amount to permissible trial tactics. One claim related to improper cross-examination of an expert and another to cross-examination of a character witness. Certainly, the basis for the expert's opinion as well as the basis for the testimony of a character witness are subject to challenge. *See Taul v. State,* 862 P.2d 649 (Wyo.1993); *Pearson v. State,* 811 P.2d 704 (Wyo.1991). This proposition refutes the claim of improper cross-examination of a character witness. We are satisfied the hearsay evidence in

question was admissible under an applicable exception to the hearsay rule.

█ The denial of testimony relating to Daniel's prior consistent statements was an appropriate application of the WYOMING RULES OF EVIDENCE by the trial court. Certainly, no abuse of discretion in that discretionary ruling is demonstrated. Daniel also wanted to produce an expert to testify that the victim could have adopted suggestions by the investigating officer because his techniques were suggestive. The trial court ruled this appeared to be an invasion of the province of the jury relating to credibility of the witnesses and refused to admit that testimony. We agree with the trial court's ruling. With respect to the claim of error arising out of an asserted comment by the investigating detective upon Daniel's refusal of the second interview, we are completely satisfied that, in the context of the trial, the question and answer were proper. It does not constitute a comment upon the exercise by Daniel of his right to silence.

█ Complaint is made about prosecutorial misconduct in questioning witnesses and closing argument. We find no basis in the record to support these claims. There was no argument involving facts not in evidence, and the asking of certain questions assuming facts not in evidence was a part of appropriate trial strategy and tactics. The prosecutor made no improper appeal to community outrage. We find no merit in any of these other claims of error.

In light of the fact that there was no objection at trial to most of these claims of error, we do not perceive any of them have merit, singularly or collectively. Consequently, we can find no justification for any cumulative error analysis, and we even express concern Daniel has been less than candid in analysis of the record.

We hold there was no abuse of discretion by the trial court in the application of the *Dean* factors to testimony offered by witnesses concerning uncharged misconduct. In the context of this trial, comments by the prosecution and the defense about other witnesses did not prejudice Daniel. The trial court did not abuse its discretion when it prohibited introduction of evidence of collateral matters during Daniel's cross-examination of the examining physician. No reversible error can be found in any other aspects of the trial.

The Judgment and Sentence of the Court is affirmed.